## COUNT VII

85.  The Plaintiff reaffirms and realleges Paragraphs 1
     through 84 above.

86.  Ms. Pine duBois the Conservation Officer of the
     Conservation Commission for the Town of Hingham filed a
     false Affidavit.

87.  On January 8, 1997, and September 19, 2002, Ms. duBois
     filed her Sworn Affidavit stating that her Degree was in
     Psychology from Loyola University.

88.  This Sworn Affidavit by Ms. duBois appears to be false.
     On checking with Loyola University they have no record
     that Ms. duBois attended Loyola.
     NOTE:  This was done by Ms. duBois to embellish her
            expertise in education and to serve in
            contradiction to the plaintiff's experts.

89.  In this instance Ms. duBois was trying to appear more
     experienced than the Engineers, Land Surveyors and
     Environmental Scientists that the plaintiff employed to
     check the wetlands lines, survey the properties and
     perform the Engineering required to design the Septic
     Systems and to draw the plans, and more importantly to
     cheat the Plaintiff.

-21-

## COUNT VIII

90. The Plaintiff reaffirms and realleges Paragraphs 1 through 89 above.

91. Peter B. Bickford, Gregory V. Sullivan and others sent letters to the Board of Health containing false information for the purpose of having the Board of Health deny and/or revoke permits.

92. The defendants after making calls to purchase the properties off the plaintiff and the plaintiff refusing to sell them to the defendants the defendants started a letter writing charade so that the Town Boards would reject or revoke the permits already issued.

93. These same defendants then started filing false complaints against the plaintiff.

94. These same defendants threatened the Plaintiff's Buyers and Potential Buyers and were then giving interviews to the Press and the Press would file the stories in the local papers.

95. These same defendants went to New Hampshire and met with the Seller of the property to the plaintiff and told him that we falsely received permits for certain lots that

were under development and that he (Gregory V.
Sullivan) needed and wanted the lots.  Mr. Marden denied
Mr. Sullivan's claims and said the Lots were percable
and he sold them to the plaintiff on this basis.

## COUNT IX

96.  The Plaintiff reaffirms and realleges Paragraphs 1
through 95 above.

97.  The Board of Health's Engineering Consultant Gale
Associates advised the Board of Health that they were
wrong in rejecting the plaintiff's Lots Numbered
1-2-3-4 and 5 on Lazell Street, and the Lots at Liberty
Pole.

98.  Edmund W. Atkinson, P.E. #16243 of Gale Associates
advised the Board of Health that they had to issue the
permits to the Plaintiff, but the Board of Health still
refused.

99.  Town Counsel, Mr. James A. Toomey sent the Board of
Health his letter that the Plaintiff's Lots 1 and 2
Lazell Street are grandfathered under M.G.L. Chapter
111, Section 127P; and Chapter 111, Section 31E.  The
Board of Health still refused to issue and/or reissue
the permits.

-23-

100.  D.E.Q.E. sent its Order of Conditions allowing Lots 1 and 2 to go forward, the Board of Health still refused to issue the permit contrary to Town Counsel's (James A. Toomey) advice.

## COUNT X

101.  The Plaintiff reaffirms and realleges Paragraphs 1 through 100 above.

102.  The Board of Health violated the Plaintiff's Statutory rights in denying him his rights inherent under c. 111, s. 127P and c. 111, s. 31E.

103.  The Plaintiff never agreed with the Board of Health's actions.  Wherein, the Board of Health intentionally bounced the Plaintiff from one demand to another over and over again, from 1986 through the present.

104.  On many occasions (From 1985 to the Present) I wrote to the Board of Health directing them to the applicable statutes, and they are:  as follows:

105.    Subsection 127P.  Land covered by subdivision plan;
        application of state environmental code
        ---------------------------------------------------

        Whenever a person has submitted a subdivision plan, or
        a preliminary subdivision plan which is followed within
        seven months by a definitive plan, or a plan referred
        to in section eighty-one P or chapter forty-one, the
        land shown on such plan shall be governed by provisions
        of the state environmental code, or of the provisions
        of local board of health regulations which differ from
        said code, which are in effect at the time of first
        submission of said plan.  Said provisions shall apply
        during the time such plan is being processed, including
        the time required to pursue or await the determination
        of an appeal relative to said plan.  If such plan is
        approved, or if it is found such approval under the
        subdivision control is not required, such provisions
        shall apply for a period of three years from the date
        of the endorsement of such approval or from the
        endorsement that approval under the subdivision control
        law is not required.

        Added by St. 1981, c. 750 Subsection 1.


106.    Subsection 31E.  Individual sewage disposal systems;
        action on applications
        ---------------------------------------------------
        Any health officer or board of health for any city,
        town or district, whose authority includes the issuance
        of permits for construction, maintenance or alteration
        of individual sewage disposal systems for residential
        buildings of not more than four dwelling units, shall
        act upon a completed application for such permit to
        construct, maintain, or alter such system within
        forty-five days from the date upon which such completed
        application is filed with said health officer or board
        of health.  If a determination on a completed
        application is not rendered within forty-five days by
        the appropriate health officer or board of health, then
        said permit shall be deemed to have been granted.

                              -25-

For the purpose of this section, a completed
application shall include, but not be limited to,
information satisfactory to any local board of health
regarding the number of deep observation holes, all
percolation test results and a plan which meets the
requirements of the state sanitary code and any local
health regulation.  Such application shall be
considered filed on the date upon which a completed
application is presented by the person who is seeking
the permit, to the health officer, board of health or
agent thereof.

For the purpose of this section, "action on a completed
application" shall mean approval of said application
and issuance of the permit to construct, maintain, or
alter, or disapproval of said application with a
written statement of the reasons for such disapproval.
The written statement of reasons, in the case of
disapproval shall be sent to the applicant by first
class mail, postage prepaid and shall include the
information necessary in order to ascertain why the
application or the proposed subsurface sewage disposal
system or both fail to comply with local or state code
requirements.

Nothing contained in this section shall be deemed to
exempt the applicant from the regulations promulgated
under the provisions of section thirteen of chapter
twenty-one A.

Added by St. 1983, c. 536.


107.    The (4) four permits that were issued by the Chairman
        of the Board of Health, Raymond E. Beale, Jr., P.E. and
        R.L.S., and the Executive Health Officer, Samuel Bosco
        and their Consultants, Civil Designs Inc., are as
        follows:

        Lot 18, Stagecoach Road
                Permit was granted on 1-22-86
                Permit was revoked on 2-13-87

        Note:   Revocation (By Catherine Salisbury of the Board
                of Health) occurred 347 days after the permit
                was issued.


-26-

Lot 20, Stagecoach Road
        Permit was granted on 1-22-86
        Permit was revoked on 2-13-87

Note:    Revocation (By Catherine Salisbury of the Board
         of Health) occurred 347 days after the permit
         was issued.


Lot 33, Stagecoach Road
        Permit was granted on 7-28-86
        Permit was revoked on 2-13-87

Note:    Revocation (By Catherine Salisbury of the Board
         of Health) occurred 347 days after the permit
         was issued.


Lot 35, Stagecoach Road
        Permit was granted on 10-06-86
        Permit was revoked on  3-31-89

Note:    Revocation (By Catherine Salisbury of the Board
         of Health) occurred 1,095 days after the permit
         was issued.


Lot 11, Hitching Post Lane
        Full application submitted under c. 111, s. 31E
        on 10-06-86 and the permit was revoked on
        5-31-87

Note:    Revocation (By Catherine Salisbury and Bruce T.
         Capman of the Board of Health) occurred 279 days
         after a full application was submitted and
         approved by The Board of Health, Raymond E.
         Beale, Jr., Chairman, Samuel Bosco, Executive
         Health Officer and their Consultant, Civil
         Designs Inc. under c. 111, s. 31E.


Lot  2, Lazell Street
        Full application submitted under c. 111, s. 31E
        on 12-31-86.  Board of Health promised to issue
        the permit on many occasions.

Note:    Revocation (By Catherine Salisbury and Bruce T.
         Capman of the Board of Health) occurred 279 days
         after a full application was submitted under
         c. 111, s. 31E.

108. Since The Board of Health has violated M.G.L. Chapter 111, Section 127P; and

M.G.L. Chapter 111, Section 31E, the Plaintiff has continually sent letters to The Board of Health demanding that the permits be reinstated.

109. The Town of Hingham's Executive Health Officer Samuel Bosco approved and issued the permits to the Plaintiff. Mr. Samuel Bosco, retired on January 1, 1987.

## COUNT XI

110. The Plaintiff reaffirms and reallges Paragraphs 1 through 109 above.

111. Mr. Raymond E. Beale, Jr. the Chairman of the Board of Health hired a new Executive Health Officer on May 26, 1987 a Mr. Bruce T. Capman.

112. When Mr. Raymond E. Beale, Jr. retired as the Chairman of the Board of Health a Ms. Catherine Salisbury was appointed.

-28-

113.  Ms. Salisbury promulgated new regulations and applied
      them to the Plaintiff contrary to the Statute and Town
      Counsels (James A. Toomey) advice.

114.  Town Counsel (James A. Toomey) sent Ms. Salisbury the
      Chairwoman of The Board of Health a letter that the
      Plaintiff's Lots were protected under M.G.L. c. 111, s.
      127P and c. 111, s. 31E.  She again disregarded his
      counsel.

115.  The Board of Health has and is still violating c. 111,
      s. 127P; and c. 111, s. 31E in issuing permits and then
      approximately (1) one to (3) years later revoking them
      and is still refusing to issue and/or reissue the
      permits.
      In part c. 111, s. 31E that applies is, as follows:

          "If a determination on a completed application is
          not rendered within forty-five days by the
          appropriate health officer or Board of Health,
          then said permit shall be deemed to have been
          granted."  All of my permits fall in this category.

### COUNT XII

116.  The Plaintiff reaffirms and realleges Paragraphs 1
      through 115 above.

-29-

117. On October 2, 1984, with Raymond E. Beale, Jr. the
     Chairman of the Board of Health along with the two
     other members Peter Barrett, M.D. and Linda Caldwell,
     R.N. Voted: to have percolation testing November 1st if
     the ground water is sufficiently high.

118. The Percolation Season is usually opened to April of
     the following year, in this case the season was closed
     on or about April 1985.

119. The Plaintiff made his appointment with the Board of
     Health to percolate his property on Lazell Street on
     December 18 and 19, 1984.

120. The Percolation Tests were conducted on December 18 and
     19, 1984 and they were witnessed by the Town of
     Hingham's Executive Health Officer, Mr. Samuel Bosco.

121. On December 21, 1984, the Executive Health officer,
     Samuel Bosco sent the Plaintiff his letter that to be
     in compliance with Title 5 of the Environmental code,
     he would require additional testing.

-30-

122.  On December 22, 1984, the Plaintiffs Registered
      Professional Engineer, Norman Levin, Registration
      #8791, sent Mr.  Bosco his letter disputing his letter
      of December 21, 1984, directing him to the requirements
      of Title 5 (cited) with the percolation testing results
      attached.

123.  On January 14, 1985, with Raymond E. Beale, Jr. the
      Chairman of the Board of Health along with the two
      other members Peter Barrett, M.D. and Linda Caldwell,
      R.N. and Guy DeLuca present Voted: "That more tests
      should be made to the satisfaction of the request of
      the Health Officer, Samuel Bosco.  The tests will be
      done on January 16 and 17."

124.  The additional Percolation Tests were conducted on
      January 16 and 17, 1985 and witnessed by Samuel Bosco,
      The Board of Health Representative.

125.  The Board of Health considered the Percolation Testing
      complete and on February 14, 1985, sent the Plaintiff
      its invoice in the sum of $150.00.

126.  On February 20, 1985, the Plaintiff sent its check in
      the sum of $150.00.

-31-

127. On June 11, 1985, the Plaintiff filed its application
     for Endorsement of Plan Believed not to Require
     Approval.

128. On June 19, 1985, the Planning Board Voted:  "Not to
     Endorse."

129. On July 8, 1985, The Board of Health Raymond E. Beale,
     Jr. the Chairman, Linda Caldwell, R.N.; and Samuel
     Bosco, the Executive Health Officer <u>VOTED:</u>  on the
     Plaintiffs Request, "The Board <u>Voted:</u> to extend the
     soil examination and percolation tests for Lots on
     Lazell Street until January 1988."

130. On August 26, 1986, Mr. Peter Bickford (now a Board of
     Health Member) gave the Board of Health a letter from
     the Loring Jacobs Company disparaging the Plaintiffs
     testing.  The letter is false.  And briefly, I respond,
     as follows:

     The results from the Loring Jacobs Company in there
     reports are, <u>qualified.</u>

     a.  "* Refusal is a drilling term indicating the depth
         of a drill hole at which further penetration is
         impossible or impractical with the equipment being
         used; and

-32-

b.  At Page 3, Mr. James of Loring Jacobs continues:

Regardless of the above issues, the Hingham Board
of Health has recently passed a rule disallowing
the use of the area between trenches for the
reserve.  The plans, as shown, appear to have based
the utilization of the area between the trenches
for reserve.  Thus, this waiver must be requested
and if not granted by the Board, area requirements
for the septic systems will significantly
increase."

NOTE:  I disagree with this comment even if the
Board of Health did pass a rule as Mr.
James claims it would have <u>no</u> effect on the
Plaintiff because of the requirements
contained in M.G.L. c. 111 s. 127P.  (See
Paragraph 105 above).

c.  Mr. James also gave Mr. Bickford advice on
"bordering Vegetated Wetlands at Lots 4 and 5."

Note:  There are no Vegetative Wetlands.

131.  On September 9, 1986, The Board of Health Member Ms.
Linda Caldwell, R.N. submitted her resignation from the
Board of Health, as soon as a replacement is appointed.

132.    On October 8, 1986, Mr. Raymond E. Beale, Jr. the
        Chairman of The Board of Health along with the two
        other members, Dr. Atkins and Ms. Linda Caldwell, R.N.
        called a meeting of the Board of Health.  Among other
        things Mr. Raymond E. Beale, Jr. the Chairman stated:

        "New Perks were taken by Norman Levin witnessed by Sam
        Bosco.

        "Neighbors are concerned new tests have been taken and
        are acceptable according to Title V", among other
        things Mr. Beale finally said:

        "It is my opinion that the testing done is good testing
        and sufficient for Permits from the Board of Health."

133.    On October 11, 1986, the Patriot Ledger came out with
        its Article on the Board of Health meeting of
        October 8, 1986, and the headline states:

                "Hingham Accepts Disputed Soil Tests."

134.    On November 6, 1986, on demands by Mr. Sam Bosco the
        Board of Health Executive Health officer ordered the
        Plaintiff to install the Potable Wells, I had them
        installed.

135.    On December 31, 1986, I submitted a package to the
        Board of Health by Certified Mail with the subject:
        Permit Application for Lot 2, Lazell Street.  And
        included:

        (4) Sets of Plans of Leaching Field
        (4) Well Location Plans
        (1) Application for Sewage Disposal System
        (1) Copy of Testing Reports
        (1) Check in the sum of $20.00.

        The Board of Health acknowledged receipt on January 2,
        1987.

136.    On January 23, 1987, Mr. Sam Bosco sent me a letter
        that he could <u>not</u> issue the permit until the
        subdivision is in compliance with the subdivision
        Control Law and is recorded in the Registry of Deeds at
        Plymouth, MA.

137.    On February 27, 1987, I sent my letter to the Board of
        Health, Attention:  Mr. Sam Bosco, requesting the
        Permit for Lot 2, Lazell Street.  As the Appeals Court
        has affirmed the Lower Court's Decision.

138.    On June 25, 1987, Mr. Raymond E. Beale, Jr. the
        Chairman of the Board of Health along with members
        Anita Barry, M.D. and Catherine L. Salisbury, Esquire,

-35-

came up with a set of fact sheets for Lots 1 through 5 Lazell Street, and they never sent them to the Plaintiff. How can the Board of Health justify these fact sheets when their actions show and the court found otherwise at the Bickford Complaint at Plymouth Superior Court CA 87-1767.

See Paragraphs 132, 133, 134, 135, 136 and 137 <u>above</u> And 139, 140, 141, 142, 143, 144, 145 and 146 <u>below</u>

139.    On October 9, 1987, Capman asked if I could do him a favor to excavate (2) holes at Lots 1 and 2 Lazell Street to satisfy the neighbors. I did, to accomodate Mr. Capman.

140.    On October 14, 1987, at this meeting Ms. Salisbury stated Town Counsel (Toomey) told her, "don't question Lots 1 and 2, they are grandfathered by c.111 s.127P."

Ms. Salisbury then said when D.E.Q.E. acts she will act.

Raymond E. Beale, Jr.:  "I second the Motion."

141.    On October 20, 1987, the Board of Health wrote me a letter reiterating what paragraph 140 above states.

142.    On March 1988, D.E.Q.E. sent its Order of Conditions allowing Lot 2 to go forward.

143.    I received an application for a Building Permit.  The
        following Boards signed it, Planning Board,
        Conservation Commission, Highway Department and the
        Fire Department.  However, the Board of Health refused
        to sign it.

144.    On October 15, 1987, Peter Bickford filed a Complaint
        (87-1767) against the Plaintiff listing Lazell Street
        (Lots 1 through 5) in Hingham.

145.    Attached to Bickford's Complaint was the Board of
        Health's Fact Sheets for Lots 1 through 5, Lazell
        Street.  How can the Board of Health justify these fact
        sheets, when their actions show and the court found
        otherwise.
        See Paragraphs 132, 133, 134, 135, 136, 137, 139, 140,
        141, 142, 143 and 144 above.

        In addition, Mr. Norman Levin, P.E. filed an Affidavit
        to Mr. Bickfords Complaint and attached his Percolation
        Tests along with the tests made in the presence of Mr.
        Capman on October 9, 1987.

146.    Judge Tuttle on October 23, 1987 dismissed the Bickford
        Complaint.  See Paragraphs 144 and 145 above.

147. On September 9, 1988, I signed a Purchase and Sale Agreement with Walter T. Sybertz for $210,000.00 for Lot 2, Lazell Street.

148. On October 25, 1988, Mr. Walter T. Sybertz received a commitment for $430,000.00 to build a home on Lot 2, Lazell Street.

## COUNT XIII

149. The Plaintiff reaffirms and realleges Paragraphs 1 through 148 above.

150. This Count, is to show how Raymond E. Beale, Jr. the Chairman of the Board of Health (B.O.H.) treated the Plaintiff different, than he treated himself, while he developed his own property at Whiting Street, Hingham, Massachusetts.

151. The Chairman of the Board of Health performed Percolation Tests at his Lot on February 13, 1985, the same Percolation Season as the Plaintiff. However, Mr. Beale while sitting as the Chairman of the Board of Health, used complete and different principles for his own property at Whiting Street.

152.  The Board of Health's Chairman, Raymond E. Beale, Jr.,
      used his own Executive Health Officer, Samuel Bosco
      (his subordinate) to witness his Percolation Tests.

153.  The Plaintiff requested an Extension of Time from the
      Board of Health and the Board of Health refused,
      stating it is their policy to give only one extension.
      However, the Chairman of the Board of Health, Mr.
      Raymond E. Beale, gave himself a (14) year (6) month
      extension at his project.  See Paragraphs 7 and 8
      above.

154.  The Chairman of the Board of Health, sent the Plaintiff
      (4) letters dated March 11, 1987, April 21, 1987, May
      6, 1987, and May 1, 1989.  However, he did not send
      these letters or attach the same requirements to
      himself at his property at Whiting Street.
      See Paragraphs 39, 40, 41, 42, 43, 44, 45, 46, 47, 48,
                      49, 50, 51, 52, 53, 54, 55, 56, 57, 58
                      and 59

155.  The Board of Health while Mr. Beale was the Chairman
      also violated the M.G.L. Statutes specifically c. 111,
      s. 127P and c. 111, s. 31E.

-39-

156.    In violating these Statutes Mr. Beale prevented the
        Plaintiff from utilizing his property as provided to
        him by the constitution in the following manner:
        See Paragraphs 105, 106 and 107 above.

157.    In contradiction to the Chairman of the Board of
        Health's letters of March 11, 1987, April 21, 1987,
        May 6, 1987 and May 1, 1989, the requirements of the
        Board of Health's Regulations, are totally different:
        See Paragraphs 117, 118, 119, 120, 121, 122, 123, 124,
                        125, 126, 127, 128, 129, 130, 131, 132,
                        133, 134, 135, 136, 137, 138, 139, 140,
                        141, 142, 143, 144, 145, 146, 147 and
                        148

158.    Finally, Mr. Raymond E. Beale, Jr. the Chairman of the
        Board of Health did <u>not</u> place any of these requirements
        on his property, during the percolation and construc-
        tion of his Septic System.

## COUNT XIV

159.    The Plaintiff reaffirms and realleges Paragraphs 1
        through 158 above.

-40-

160.  The Plaintiff while performing Percolation Tests at
      Lots 1 through 5 Lazell Street signed an agreement to
      purchase Lot 8 from Brian Lewis.

161.  I retained a Mr. Norman Levin, P.E. Registration
      No. 8791, to perform the Percolation Tests on November
      15, 17 and 27, 1984.

162.  On October 31, 1985, we spent cleaning and picking up
      stumps.

163.  On December 18, 1985, we spent the day performing
      exploratory holes preparing them for the taking of
      Percolation Tests.

164.  On January 15, 1986, Norman Levin, P.E. was still
      probing the area for suitable materials.  The Board of
      Health Agent, Mr. Samuel Bosco would not accept any
      area that we believed to be suitable to accept a
      leaching field.

165.  On February 4; July 15 and July 23, 1986, we were faced
      with the same rejections by Mr. Samuel Bosco the Board
      of Health Representative as we did at Paragraphs 157
      and 158 above.

-41-